IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Criminal Case No. 00–cr–00482–EWN

UNITED STATES OF AMERICA,

    Plaintiff/Respondent,

v.

DALE CHALLONER

    Defendant/Movant.

---

**ORDER DENYING SECTION 2255 MOTION**

---

    Defendant Dale Challoner was convicted of seven counts arising from an elaborate scheme pursuant to which he and several companions planned to rob a bank in La Junta, Colorado, by invading the home of the bank president and having one conspirator hold the president's wife hostage while another conspirator drove the president to the bank and forced him at gunpoint to open the bank safe. To divert the attention of law enforcers, the conspirators fire-bombed an elementary school. The details of the scheme have already been recited by the Tenth Circuit in an unpublished disposition affirming the convictions, and it would serve no purpose to reiterate them here. *See United States v. Challoner*, 2003 WL 21000995 (10th Cir. May 5, 2003).

    Because the scheme engendered convictions on charges that Defendant used firearms and explosives to commit the other crimes — convictions requiring three consecutive sentences —

the court sentenced Defendant to a 1,080-month prison term. The convictions became final on October 6, 2003, when the Supreme Court declined to review the Tenth Circuit's affirmance thereof.

Defendant asserts three claims in this collateral attack on his convictions. The first two claims assert that Defendant did not receive effective assistance of counsel during his proceedings before this court. The first claim contains numerous sub-parts, each based on an example of alleged ineffectiveness, and it is not entirely clear to the court why the second claim is set forth separately, rather than as another sub-part. The court will nevertheless, for clarity, follow Defendant's organizational approach.

*Claim One*

Claim One alleges a number of ways in which Defendant's trial counsel, Jeffrey Edelman, was allegedly ineffective. At a number of points sprinkled throughout his motion, Defendant argues that the motive for a particular act or omission by Mr. Edelman, and the ultimate reason for Mr. Edelman's alleged lack of preparation and uninspired trial performance, was that Mr. Edelman labored under a conflict of interest. The court will therefore discuss the alleged conflict first, and then it will examine counsel's substantive performance.

The court begins by recognizing that the sixth amendment right to effective assistance of counsel encompasses "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271 (1981) (citing *Cuyler v. Sullivan,* 446 U.S. 335[1980] and *Holloway v. Arkansas,* 435 U.S. 475[1978]). Typical conflict of interest cases giving rise to claims of ineffective assistance of counsel involve multiple representation of co-defendants at a

single trial, *see Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir.1988) (citing cases), or other situation in which a defendant's counsel owes conflicting duties to defendant and some third person." *See United States v. Soto Hernandez,* 849 F.2d 1325, 1328 (10th Cir.1988) (citations omitted). Defendant's case differs significantly from these typical reported cases, because it is clear that any potential conflict arose solely because Defendant had, at the very least, threatened to sue his counsel (and in fact at one point subsequent to trial filed a grievance against him) and because both Defendant and his counsel came before the court several times to air their grievances. The court has located no ineffective-assistance cases involving a defendant-created conflict, perhaps because most such cases are analyzed in terms of whether defendant's conduct and difficult behavior arises to the level of implied waiver of the right to *any* appointed counsel. As recited below, the court never found an implied waiver, nor, as a matter of fact, did it find any conflict of interest.

Defendant and/or counsel brought their differences to the court on three occasions before trial and twice after trial. The first such instance was Defendant's *pro se* motion to be relieved of inadequate counsel (Doc. 124), filed approximately one week before a substantive motions hearing in what was then a multi-defendant case. The court heard the motion a day after its filing (Doc. 519). Defendant accused counsel of being "negative," stated that counsel had "called him stupid," and stated that counsel was not "trying to the best of his ability." He also complained that counsel was "chitchatting and laughing" with the prosecutor before the court took the bench. The court addressed all of his concerns, concluding that, at most, Mr. Edelman had been candid and blunt in his evaluation of the case and did not hold out much hope for

-3-

success. As the court observed then, there is "nothing wrong" with that. This conclusion is not changed either (1) by Defendant's new recitation — advanced for the first time in the section 2255 motion — that counsel was pressing him to negotiate a plea for thirty-two years of time (approximately one-third of his ultimate sentence) or (2) by Defendant's speculation that counsel did not prepare because he mistakenly thought there would be a plea agreement. Indeed, to the extent that they prove anything, subsequent developments in the case tend to support the inference that counsel's advice to accept a plea for thirty-two years was sound.

The disagreements between Defendant and his attorney came before the court a second time when Defendant filed another motion to have a new attorney (Doc. 149), this one styled "Inafective Consel Notice of Intent to Sue [sic]." This was followed by Mr. Edelman's motion to withdraw on the ground that Defendant had filed notice of intent to sue him (Doc. 171). At the hearing on this motion, the court asked Defendant to elaborate on the conclusory assertions in his filing. Defendant explained that he had prepared his filing a couple of days before an omnibus motions hearing involving all Defendants out of a feeling that Mr. Edelman wan not able to help him and that plea discussions had left him feeling that Edelman had somehow allowed Defendant to incriminate himself. Defendant indicated that he had changed his mind and was satisfied that counsel was doing his best in the circumstances. He withdrew the notice of intent to sue. For his part, Mr. Edelman stated that he was not worried about being sued and that he had filed his motion to make a complete record and avoid possible later reprimand for not bringing the issue to the court's attention. The court concluded then, and continues to believe now, that counsel/client relations had improved subsequent to Defendant's filing of the notice of

intent to sue, that there was no conflict of interest, and that there was absolutely no indication that Defendant was receiving ineffective assistance of counsel.

The third and final pre-trial instance where the court was asked to relieve counsel was presented by Mr. Edelman's second motion to withdraw, filed less than two weeks before trial (Doc. 219). The motion was precipitated when a private investigator hired by Mr. Edelman tried to meet with Defendant at the Federal Detention Center. Defendant became angry, evidently when he learned that the meeting was not going to be with Edelman personally. The motion suggested elliptically that Defendant had made some threat of violence which might have been directed at counsel. According to the motion, Defendant again threatened to sue Edelman, "depending on how much effort Challoner felt that Edelman put into his case."

The court held a hearing on this motion the following week (Doc. 522). The court engaged Defendant in colloquy, expressing its concern that Defendant was "digging [himself] in deeper and deeper" and asking whether Defendant had threatened physical harm. *Id.* at 10. Defendant denied any threat to anyone and reiterated several times that he anger was not directed toward Mr. Edelman. His explanation, which the court continues to think bizarre, was that he was warning the prison guards that, if he got more bad news about his case, they might as well take him to "the hole" (the disciplinary segregation unit) because he was likely to commit some disciplinary infraction. As to whether he had again threatened to sue counsel, Defendant equivocated, saying, "I didn't say I actually was." *Id.* at 12. As the colloquy progressed, Defendant's expressions of dissatisfaction devolved into a complaint that counsel was not adequately communicating with Defendant or keeping him informed about the case. The court

reminded Defendant that threats to sue were counterproductive because they directed counsel's attention away from substantive preparation of the case. Defendant twice stated that he had "no problem" with Mr. Edelman's continuing as his lawyer.

For his part, Mr. Edelman accepted Defendant's explanation that Defendant had never intended to threaten him, and the court ultimately found that there had been no such threat. He continued to express some concern about a lawsuit by Defendant and about the diversion of resources occasioned whenever Defendant started attacking him. The court then repeated to Defendant its question about diversion of resources, and Defendant responded that he understood and that the problem would resolve itself if there were better communication. After asking the deputy U.S. marshal to facilitate telephone communication between Defendant and counsel, the court noted that the court file contained Criminal Justice Act requests for money for various defense purposes and found every reason to expect that Mr. Edelman would continue to conduct a vigorous defense. The court found no facts which would constitute a conflict of interest and concluded that there was no sixth amendment problem with Mr. Edelman's continuing as counsel. Nothing in Defendant's new submissions creates any colorable claim that this conclusion was wrong.

After trial, Mr. Edelman filed two additional motions to withdraw. For completeness, the court will mention them, although neither affects the court's past or present analysis. The first post-trial motion to withdraw, filed four days before the sentencing hearing, alluded to an undisclosed writing in which Defendant had evidently accused Edelman of having "lost on purpes.[sic]." The second post-trial motion was filed months after sentencing but before entry of

a written judgment. Both Defendant and counsel had already filed a premature notice of appeal. This second motion recited that Challoner had filed a grievance against Edelman with the Colorado Supreme Court. Addressing the first post-trial motion, this court, without further discussion at the sentencing hearing, noted that Edelman had declared his intent to file an immediate notice of appeal and stated "I'm going to withdraw [sic] your motion to withdraw. The appellate court can address that matter." On May 20, 2002, the court of appeals granted this first post-trial motion to withdraw (which was, in fact, Mr. Edelman's *third* motion to withdraw in the case) and appointed Robert Berger as appellate counsel. There is nothing new in either of Edelman's post-trial motions which demonstrates a conflict or furthers the analysis concerning effective assistance of counsel.

Viewing the entirety of the attorney-client relationship outlined above, the court recognizes that there was tension in the relationship, that Defendant and counsel did not always agree, and that Defendant expressed varying degrees of dissatisfaction when the question was presented to the court. Although indigents in criminal cases have a fundamental right to have counsel appointed to represent them, there is no corollary right to have any special rapport or confidence in court-appointed counsel. *See Morris v. Slappy,* 461 U.S. 1(1983), and it is the court, not a defendant, who chooses appointed counsel and decides when counsel should be relieved of his duties. In *Morris,* the Supreme Court rejected the notion that the Sixth Amendment guarantees a criminal defendant a "meaningful relationship" with his counsel. The right to counsel does not include more than the right to representation by competent counsel at trial. The court will now proceed to determine whether Mr. Edelman's alleged acts or omissions

rise to the level of ineffective representation, but it will do so without using the prism proposed by Defendant — that counsel's acts and omissions are rooted in, and explained by, a non-existent conflict of interest.

The court evaluates claims that Defendant received ineffective assistance of counsel under the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1988) and its progeny. "Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, with performance being measured against an objective standard of reasonableness under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (citations and internal quotation marks omitted). In order to prevail on a claim of ineffective assistance, Defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland*, 466 U.S. at 687, and that (2) counsel's performance prejudiced him in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. When reviewing an ineffective assistance of counsel claim, the court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Guided by *Strickland,* the court proceeds under a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, . . . the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689). Strategic decisions of trial counsel are ordinarily

shielded from charges of ineffectiveness. "'Tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance.'" *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995) (quoting *United States v. Ortiz Oliveras,* 717 F.2d 1, 3, (1st Cir. 1983). "For counsel's advice to rise to the level of constitutional ineffectiveness, the decision [of counsel] must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Hatch*, 58 F.3d at 1459 (quotation omitted).

This deference to an attorney's strategic trial decision will stand unless the decision itself was objectively unreasonable. *Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002). But "[w]here it is shown that a particular decision was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.'" *United States v. Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005) (citing *Bullock*, 297 F.3d at 1044).

"[T]he mere incantation of 'strategy' [however] does not insulate attorney behavior from review." *Bullock*, 297 F.3d at 1048 (internal quotation marks and citation omitted). "[T]he ultimate inquiry when deciding whether an attorney performed in a constitutionally deficient manner is not whether the counsel's actions can be considered strategic, but whether, under all the circumstances, counsel's actions may be considered objectively reasonable." *Id.* at 1041.

Guided by the principles stated above, the court now proceeds to consider, first, Defendant's various specific assertions of ineffectiveness against Mr. Edelman made as part of the first claim in his section 2255 motion. The first assertion is that Edelman failed to obtain and

use exculpatory scientific evidence. This claim is also tied to the more general assertion that Edelman did not investigate the case or prepare for trial. Specifically, Defendant maintains that fingerprint evidence and DNA testing would have demonstrated that he was not involved in the crimes charged.

The primary problem with this first assertion of ineffectiveness is that the trial record disproves it. As an initial matter, the court rejects Defendant's claim that Edelman did not obtain this evidence and that Defendant got it through post-trial requests of governmental agencies. As the Government points out, the attachments to his section 2255 motion establish that his post-trial requests were *rejected* by the investigating agencies. Moreover, the trial record discloses that Edelman was aware of fingerprint evidence and DNA testing and, in this court's view, used it as effectively possible at trial. Among the stipulations which Edelman entered with the Government was that fingerprints were developed on items taken from two crime scenes and that the fingerprints were not Defendant's (Doc. 255). During his closing, Edelman pointed out that neither Defendant's fingerprints nor his DNA were recovered during the investigation (Doc. at 823–24). Contrary to Defendant's current suggestion, the testing does not conclusively negate his involvement in the crimes, and Edelman's exploitation of the test results was well within the bounds of professional competence.

Defendant's second specific assertion of ineffectiveness concerns Edelman's alleged failure to develop the differences between Defendant's description and that of a person seen running away from the elementary school after it had been firebombed. Again, the argument is contradicted by the trial record. As Defendant correctly notes, a witness named Monica

Apodaca testified that the fleeing person was wearing a red flannel shirt and was tall and thin. Contrary to Defendant's minor factual premise, however, Edelman did develop testimony from a co-defendant, Sherri Jackson, that Defendant was wearing a black shirt on the night in question (Doc. 396 at 144–45). He then argued the discrepancy to the jury during his closing argument (Doc. 399 at 821–22). The jury, of course, had ample opportunity to observe Defendant during trial and could judge for itself whether he fit the "tall and thin" aspect of the description. The court therefore rejects Defendant's second claim of ineffectiveness.

Defendant's third specific assertion of ineffectiveness involves an alleged failure to impeach the co-defendants who struck a plea bargain and testified against Defendant. Once again, the trial record establishes the contrary. Attacking the credibility and motivation of the three testifying co-defendants was a central part of Edelman's strategy. He emphasized it in his opening statement (Doc. 396 at 21–27). He spent a great deal of time cross-examining each of the three testifying co-defendants (Doc. 396 at 126–53; Doc. 397 at 419–45; Doc. 398 at 599–616). He again stressed it during his closing argument (Doc. 399 at 824–32). The court thus rejects Defendant's third specific assertion of ineffectiveness.

Defendant's fourth assertion of ineffectiveness concerns counsel's stipulation to fifty-four exhibits and failure to adhere to Defendant's suggestions in formulating trial strategy. All stipulations in this case were docketed together (Doc. 255). The stipulations covered more than fifty-four exhibits, and Defendant does not specify which exhibits Edelman should have objected to. His attack, therefore, is so general, unfocused, and conclusory that the court cannot discern any basis for his argument. As the Government points out, none of the stipulations undercut his

basic theory of the case — that the various acts had been perpetrated by someone without any involvement by Defendant. The court thus regards the decision to stipulate as one concerning strategy and tactics. Far from being "completely unreasonable," *Hatch*, 58 F.3d at 1459, the decision appears, in this court's view, to reflect sound trial strategy of (1) minimizing the in-court repetition of the underlying chillingly-violent acts, (2) avoiding the time-consuming spectacle of having the Government call witnesses formally to authenticate and lay foundations for evidence to which Defendant had no legitimate objection, and (3) narrowing the contested issues to those important to Defendant's theory of the case. Similarly, the fact that counsel did not consult with Defendant concerning general issues of strategy does not demonstrate ineffectiveness.

Defendant's fifth assertion of ineffectiveness in connection with claim one of his motion generally alleges that Edelman did not investigate or prepare. The court has already addressed the argument, to the extent that Defendant has pointed to specific manifestations of lack of investigation or preparation. With respect to anything which remains, the court's own records in this case contradict any inference that Edelman was not investigating and/or preparing Defendant's case. Before trial, pursuant to the Criminal Justice Act, Edelman filed numerous *ex parte* applications for the appointment of — and payment of fees in excess of ordinary CJA maximum amounts to— a private investigator, another lawyer to assist him, and a paralegal to assist him in the defense. *E.g.,* Docs. 81 (appointing private investigative firm), 246 (authorizing excess payment to investigative firm), 304 (authorizing excess payment to firm), 369 (authorizing excess payment to firm), 321 (authorizing payment to other lawyer), 302

(authorizing payment to paralegal).[1] He filed numerous pretrial motions, including substantive motions to sever (Doc. 64) and to suppress Defendant's statement to investigators (Doc. 65). He filed motions for subpoenas of witnesses (Docs. 174, 226). At the trial preparation conference, he filed a witness list (Doc. 252), proposed voir dire questions (Doc. 253), and an exhibit list (Doc. 254). After trial, he filed a sentencing statement (Doc. 283) and numerous objections to calculations in the pre-sentence report (although those objections were not on the court's docket, since they are part of the confidential pre-sentence report). The trial record itself evidences this preparation and investigation. The court is thus satisfied that Defendant's non-specific assertions concerning lack of preparation and investigation are without merit.

Defendant's second habeas claim, which is evidently separated from the first because it concerns sentencing issues, is that he received ineffective assistance of counsel because his trial counsel failed to advance the argument that this court should not apply guideline enhancements on the basis of facts not proven to the jury, in violation of rules stated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and developed in *Blakely v. Washington*, 542 U.S. 296 (2004). In order to show ineffective assistance of counsel, Defendant must satisfy a two-pronged test by showing: (1) "counsel's representation fell below an objective standard of reasonableness" (the performance prong); and (2) "there is a reasonable probability that, but for counsel's professional

---

[1] As permitted by the Criminal Justice Act, these sorts of materials are filed *ex parte* so that a defendant's trial strategy and preparation are not revealed to the Government and others. They are thus not in the public record of the case but, rather, have a "placeholder" docket number in the public file. Because the trial and appellate proceedings are concluded and trial counsel's effectiveness is being attacked, the court concludes that it is appropriate and in the public interest to disclose them. The materials are thus appended to this order.

error, the result of the proceeding would have been different" (the prejudice prong). *Strickland,* 466 U.S. at 688, 694.

Defendant's second claim fails both *Strickland* prongs. Counsel's omission of this argument does not, in this court's view, demonstrate ineffectiveness. *Apprendi*, which had been decided before Defendant's sentencing, had simply ruled that any fact which increased the penalty for a crime beyond the maximum statutory penalty specified for the offense of conviction had to be proven to a jury beyond a reasonable doubt. *Blakely*, decided some nine month *after* Defendant's conviction here became final, extended the *Apprendi* rule to hold that the sixth amendment right to a jury trial precluded a judge from imposing a sentence exceeding the maximum sentence permitted on facts admitted by defendant in a plea agreement. Notwithstanding the uncertainty it engendered concerning the federal guidelines, *Blakely* explicitly declared that it was expressing no opinion on the guidelines. That question was answered only when *United States v. Booker*, 543 U.S. 220 (2005) ruled that the guidelines' sentencing enhancements could be based on facts which a judge found by a preponderance of the evidence, as long as the guidelines were treated as advisory. Applying "an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, this court concludes that counsel's failure to anticipate the tortuous course of events between *Apprendi*, *Blakely,* and *Booker* does not fall below that standard.

The court further concludes that counsel's omission of the argument concerning improper fact finding by the court at sentencing cannot possibly have prejudiced Defendant. *United States v. Mora*, 293 F.3d 1213, 1219 (10th Cir. 2002) (*Blakely* not retroactive); *Bey v.*

*United States*, 399 F.3d 1266 (10th Cir. 2005) (*Booker* not retroactive). Since Defendant's conviction became final some nine month before the decision in *Blakely*, counsel's preservation of the argument would have been not only prescient but futile, since the rule in *Blakely* was still unknown. Even if there were not a retroactivity problem, the most which Defendant could argue here under *Booker* is that the court should have treated the guidelines as advisory in sentencing him. This argument fails. Since the bulk of Defendant's sentence (the sixty-five-year consecutive statutory minimums for the firearms and explosives counts) could not be affected by treating the guidelines as advisory, the only discretionary aspect was the twenty-five-year concurrent sentence on the underlying charges — the guideline and statutory maximum. Because of the aggravated circumstances of the offense (adequately reflected in the guideline enhancements), Defendant's manifest lack of remorse, the need to deter criminal schemes of this nature, and the need to protect the public from this sort of conduct, the court would have imposed this same discretionary sentence by looking at all the factors specified in 28 U.S.C. § 3553(a).

Defendant's third habeas claim is that this court erred in imposing consecutive sentences for the use of multiple firearms during a single underlying predicate offense. When this court recently directed supplemental briefing in this case (Doc. 622), the court mistakenly thought that the claim had been raised neither at the trial or appellate level. It was, in fact, raised and developed (by Mr. Edelman) at the trial level, but it was not pursued by Defendant's subsequently-appointed appellate counsel. It was available both during the trial and on direct appeal and therefore should have been raised on direct appeal. Ordinarily, "[s]ection 2255 is not

*United States*, 399 F.3d 1266 (10th Cir. 2005) (*Booker* not retroactive). Since Defendant's conviction became final some nine month before the decision in *Blakely*, counsel's preservation of the argument would have been not only prescient but futile, since the rule in *Blakely* was still unknown. Even if there were not a retroactivity problem, the most which Defendant could argue here under *Booker* is that the court should have treated the guidelines as advisory in sentencing him. This argument fails. Since the bulk of Defendant's sentence (the sixty-five-year consecutive statutory minimums for the firearms and explosives counts) could not be affected by treating the guidelines as advisory, the only discretionary aspect was the twenty-five-year concurrent sentence on the underlying charges — the guideline and statutory maximum. Because of the aggravated circumstances of the offense (adequately reflected in the guideline enhancements), Defendant's manifest lack of remorse, the need to deter criminal schemes of this nature, and the need to protect the public from this sort of conduct, the court would have imposed this same discretionary sentence by looking at all the factors specified in 28 U.S.C. § 3553(a).

Defendant's third habeas claim is that this court erred in imposing consecutive sentences for the use of multiple firearms during a single underlying predicate offense. When this court recently directed supplemental briefing in this case (Doc. 622), the court mistakenly thought that the claim had been raised neither at the trial or appellate level. It was, in fact, raised and developed (by Mr. Edelman) at the trial level, but it was not pursued by Defendant's subsequently-appointed appellate counsel. It was available both during the trial and on direct appeal and therefore should have been raised on direct appeal. Ordinarily, "[s]ection 2255 is not

available to test the legality of matters that should have been raised on direct appeal." *United States v. Walling* 982 F.2d 447, 448 (10th Cir. 1992), *citing United States v. Khan,* 835 F.2d 749, 753 (10th Cir.1987). Defendant's failure to raise these claims in his direct appeal bars review unless he can show cause and resulting prejudice. *Id*.

With respect to the issue of cause, *Murray v. Carrier,* 477 U.S. 478 (1986), held that ineffective assistance of counsel may constitute cause for a procedural default. Defendant's newly-appointed counsel in this proceeding has argued that appellate counsel was ineffective for failing to pursue the argument. However, "so long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in Strickland v. Washington, there is no inequity in requiring him to bear the risk of attorney error that results in a procedural default." *Carrier*, 477 U.S. at 488. In this court's judgment, the most efficient way to address the entire third habeas claim in this case is to determine whether the claim has any merit. If it has no merit, then Defendant cannot have been prejudiced by appellate counsel's failure to raise the issue on direct appeal.

The court believes that the third habeas claim would fail on the merits. The claim has two aspects. The first aspect is that this court should not have imposed separate consecutive sentences for counts three and five. Count three charged Defendant with using, carrying, and brandishing a firearm (a shotgun) during and in connection with a predicate crime of violence, namely, the attempted armed bank robbery charged in count two. Count five charged Defendant with using, carrying, and brandishing a destructive device (a Molotov cocktail) during and in connection with a predicate crime of violence, namely, the conspiracy to commit armed bank

robbery charged in count one. The use, carrying, and brandishing of each device was alleged to be a separate violation of 18 U.S.C.A. § 924(c), which mandates that any person convicted of the two firearms offenses receive consecutive sentences.

Notwithstanding the language of section 924(c), Defendant claims that the sentences should not have been consecutive. He relies on a line of cases which stand for the proposition that a court cannot impose separate consecutive sentences when a defendant has been convicted of using, brandishing, or carrying different firearms during an in connection with *the same* predicate offense — *e.g., United States v. Cappas*, 29 F.3d 1187 (7th Cir. 1994); *United States v. Parra*, 2 F.3d 1058, 1070–71 (10th Cir. 1993) — or with predicates offenses which had to be treated as the same offense under the rule of *Blockburger v. United States*, 284 U.S. 299 (1932) — *e.g., United States v. Chalin*, 812 F.2d 1302, 1315–17 (10th Cir. 1987). The cases cited by Defendant are all distinguishable because they involved the use of multiple firearms during the commission of a single substantive offense. Here, Defendant and his accomplices were charged with using a shotgun in connection with the substantive offense of attempted armed bank robbery and a Molotov cocktail in connection with the offense of conspiracy to commit armed bank robbery. "[T]he commission of robbery and conspiracy to commit robbery are separate crimes." *United States v. Davis*, 573 F.2d 1177, 1180 (10th Cir. 1978). There is no legal obstacle to consecutive sentences for such crimes. *Id.* Consecutive sentences are likewise appropriate for the section 924(c) charges "so long as the court's instructions require the jury to connect each gun use to a separate offense." *Cappas*, 29 F.3d at 1190. *See also United States v. Floyd*, 81 F.3d 1517, 1527 (10th Cir. 1996). Here, the court's instructions did require the jury to

connect the shotgun to the attempted robbery and the Molotov cocktail to the conspiracy. (Doc. 399 at 900 – 08.) The jury verdict did so in its verdict (Doc. 265).[2]

As mentioned earlier, there is a second aspect to Defendant's third claim. This second aspect focuses on the 120 month consecutive sentence imposed on count fourteen. This count charged that Defendant "used fire and an explosive" and that he "did carry an explosive" to commit the federal felonies of conspiracy to commit armed bank robbery (count one) and attempted armed bank robbery (count two), in violation of 18 U.S.C.A. § 844(h). Section 844(h) requires, in Defendant's case, a ten-year sentence that cannot "run concurrently with any other term of imprisonment including that imposed for the felony in which the explosive was used or carried." Relying on the same authorities cited in connection with his arguments on counts three and five, Defendant maintains that there cannot be a consecutive sentence on count fourteen

---

[2]The submissions by Defendant and subsequently-appointed counsel suggest that the jury's handwritten annotations on the jury form somehow provide some support for their arguments. The court disagrees. In instructing the jurors that they must be unanimous concerning the means by which the statute was violated, the court pointed out that each count charged the alternative means of using, carrying, brandishing, or possessing in furtherance of the predicate crime. (*See* Doc. 399 at 900 *et seq*.) The court instructed the jury that it must be unanimous as to which of the means occurred. The court understands the jury's annotation on count three simply to be a declaration that the jury was unanimous as to the means of "using, carrying & brandishing." during and in relation to the attempted armed bank robbery.

Likewise, concerning count five, the Government had charged similar alternate means — using, carrying, and possessing in furtherance of the predicate offense. It had also charged alternate predicate offenses — conspiracy to commit armed bank robbery, as charged in count one, and arson, as charged in count four. The court therefore additionally told the jury that it had to be unanimous as to which predicate offense was proven. The reasonable interpretation of the jury's annotation on count five — "carrying – as per ct. #1" — is that the jury was unanimous in concluding that Defendant was guilty of violating section 924(c) by carrying the Molotov cocktail in furtherance of the predicate offense of conspiracy to commit bank robbery.

because it is based, at least in part, on Defendant's carrying of the Molotov cocktail which was itself the basis for the consecutive section 924(c) sentence on count five.

The court disagrees with Defendant. The jury, in its handwritten annotations to the verdict (Doc. 265), clearly indicated a unanimous finding that Defendant was guilty of "carrying" an explosive and that he committed it during *both* of the alternative felonies charged "per cts #1 and #2." Assuming that the court were to accept Defendant's argument that his line of section 924(c) cases should be extended to charges under a separate statute,[3] section 844(h), the argument would, at most, suggest that there should be no consecutive sentence for counts five and fourteen, since the jury found, with respect to both these counts, that Defendant "carried" the Molotov cocktail in furtherance of the count-one conspiracy to commit armed bank robbery. The problem with this suggestion is that the jury in count fourteen *additionally* found that Defendant also "carried" the Molotov cocktail in furtherance of the count two attempted armed bank robbery. There would thus appear to be no legal obstacle to imposing separate consecutive sentences for count three (using, carrying, and brandishing the shotgun) and count fourteen (carrying the Molotov cocktail) in furtherance of the attempted armed bank robbery charged in count two.

For the reasons stated, it is

---

[3]As the Government points out, there is no authority suggesting that this line of section 924(c) cases — prohibiting convictions and consecutive punishment for carrying, using, or brandishing different firearms during a single predicate offense — should be extended to charges under section 844(h). The cases interpreting section 844(h) hold that sentences for violating section 844(c) may be consecutive to sentences imposed for the underlying felony. *E.g., United States v. Grassie*, 237 F.3d 1199, 1215 (10th Cir. 2001)

**ORDERED** as follows:

1. Defendant's section 2255 motion (#609) is DENIED.

2. The motion for DNA testing (#615) and the motion concerning prosecutorial misconduct (#616), being without merit, are DENIED.

Dated this 10th day of September, 2008.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge